*1108 OPINION.
Green :
The principal question in these cases is one of fact, namely, the fair market value on March 1, 1913, of the inventions, application *1109 for patents and patents owned by the petitioner on that date. A very considerable number of witnesses testified in behalf of the petitioner. The respondent offered no proof in support of his determination.
Our determination of value, as set forth in the findings of fact, is to no small extent predicated upon the testimony of four witnesses who testified as experts. We regard each of these witnesses as well qualified to express an opinion of value. Each had had a broad experience in the glass-making industry, though they had devoted themselves primarily to different phases of the work. It is not mere coincidence that these four men of undoubted ability and experience should arrive at practically the same valuations for all the rights and for the bulb and nonbulb rights. One of these witnesses, Dr. Arthur L. Day, is now a director of the Geophysical Laboratory of the Carnegie Institute at Washington. He is an engineer and has specialized in the science of heating and melting. He was president of the petitioner company in 1913, and has been a director and vice president of the Corning Glass Works for the past ten years. After detailing his knowledge of all of the conditions which would affect the value of the petitioner’s inventions, applications and patents, he testified that in his opinion they could have been sold on March 1,1913, for $2,000,000; that the bulb rights could have been sold for $1,000,000; and that the nonbulb rights could have been sold for from $1,000,000 to $1,500,000.
A second witness called to express his opinion of value was George D. Macbeth. Macbeth has devoted the last sixteen years to the glass-making industry, being now the president of the Macbeth-Evans Glass Co. and thoroughly familiar with the use and value of all machines used in the industry. His testimony was confined to a valuation of the rights to use the “ E ” machine for the making of lamp chimneys and, after detailing his knowledge of the entire situation, he gave it as his opinion that such rights, on March 1, 1913, would have been worth at least $500,000.
The third witness was Harry L. Heintzelman, who for the last twenty-five years has been president and general manager of the Monongah Glass Co. After detailing his 39 years of experience in the industry, and his knowledge of the facts and circumstances surrounding the “ E ” machine, he testified that the conservative valuation of the nonbulb rights as of March 1,1913, would be $900,000.
The last of these -witnesses to be called was Samuel W. Banning, a patent attorney, who has had a broad experience in valuing, buying and selling patent applications and patents. There was propounded a hypothetical question in which was included all of the material facts and circumstances proven by the testimony of the prior witnesses. After a careful analysis of the entire situation, he testified *1110 that in his opinion the inventions, applications and patents had, on March 1,1913, a fair market value of at least $1,850,000; that the fair market value on that date of the bulb rights was at least $750,000; and that the fair market value on that date for the nonbulb rights was $1,100,000.
These valuations confirm and support the valuation made by Alanson B. Houghton in 1913, and indicate that his appraisal as of that date was based upon a sound knowledge of the industry and its needs and the usefulness of the “ E ” machine in the manufacture of glass. Such appraisals actually made at or about the date as of which we are called upon to determine the valuation, particularly when made for other than tax purposes, should be given a very considerable weight in the determination of facts.
We regard all of this evidence as more than sufficient to overcome the presumption of correctness attached to the respondent’s determination and as amply sufficient to sustain our finding of fact that the inventions, applications and patents had a total value of $2,000,000 as of March 1, 1913, that the value of the bulb rights on that date was $1,000,000, and that the value of the nonbulb rights on the same date was $1,000,000.
The respondent contends that where a taxpayer on March 1, 1913, has only an application for a patent, he may not, when the patent is subsequently issued, be allowed exhaustion based upon the March 1, 1913, value of the application, but that he must be content with an allowance for exhaustion based upon the cost of the patent. This question has been before us in similar cases and we have consistently held that, where the patent application owned by the taxpayer on March 1, 1913, subsequently ripened into a patent, the taxpayer was entitled to an allowance for exhaustion based upon the March 1, 1913, value of the application, plus subsequent expenditures starting with the date of the issuance of the patent. See Individual Towel & Cabinet Service Co., 5 B. T. A. 158; Hershey Manufacturing Co., 14 B. T. A. 867; and Stephens-Adamson Manufacturing Co., 16 B. T. A. 41. In the petitioner’s brief is a discussion of the question of the allowance of the value of non-bulb rights as cost of foreign sales. The pleadings raise no similar issue and we, accordingly, have given no consideration to this question.
The remaining question in the case is whether the petitioner is entitled to an allowance for the exhaustion “of certain term contracts acquired by the petitioner for the immediate benefit of the petitioner’s subsidiary and thereby for the indirect but actual benefit of the petitioner.” Only one such contract was offered in evidence, although it is apparent that there was a somewhat similar one between the same parties at a later date.
*1111 The provisions of the contract material to the issue thus raised are that the General Electric Co. was to enter into royalty contracts with the American Blank Co. and to pay to the petitioner the amount of money which the petitioner had expended in the development of the inventions, in consideration of which the petitioner was to convey to the General Electric Co. a large number of shares of the American Blank Co. As we understand the petitioner’s contention, it is that the difference between the par value of the stock thus conveyed and the amount of cash received from the General Electric Co. represents a capital expenditure by the petitioner, which it is entitled to exhaust or amortize over the life of the contract. It is, of course, true that the petitioners had parted with shares of stock of a substantial value, but it does not necessarily follow that in exchange therefor they had acquired an exhaustible asset. We axe unable to see that the petitioner herein has anything in the nature of property, which it could have sold or disposed of. What it bargained for was the contract primarily of value to its subsidiary. This the subsidiary got, and while the indirect benefits, in part as least, come to this petitioner, it seems clear to us that the petitioner acquired no property right as the result of the expenditure.
Even if the petitioner were correct in its contention that it acquired a property right as to which it was entitled to an allowance for exhaustion, we would still be impelled to disallow the deduction, for the reason that it clearly appears from the contract that, in addition to the royalty agreement between the General Electric Co. and the subsidiary,' the petitioner obtained other and further valuable rights, the life of which can not be determined. We refer particularly to those provisions of the contract which provide that the contract shall remain in effect “ until the expiration of the terms of the then existing patents and the patents which shall be granted subsequently on applications for patents which have been applied for by that date ”; that “ all inventions including machines, processes and apparatus relating to glass blowing by machinery, which are now or may hereafter become the property of or under the control of the General Company or the Corning Company, or the Empire Company, shall, ⅜ * * inure within the United States to the exclusive benefit of the American Company * * * ”; and that “ Neither the General Company, nor the Corning Company nor the Empire Company shall acquire any rights within the United States to inventions of the class specified, unless the other parties to this agreement shall have opportunity to acquire equal rights to use the same upon the same terms.” These and other provisions of the contract indicate clearly that there were therein many other provisions for the benefit of this petitioner, many of which could not be classified as property subject to exhaustion and to use. It seems impossible to segregate *1112 and value the royalty provisions of the contract from the remainder thereof, and we have, accordingly, concluded that the petitioner is entitled to no allowance by reason of the exhaustion of this contract. The respondent’s determination on this issue is approved.

Judgment will be entered wider Rule 50.